COMMONWEALTH vs. DAVID K. RICARDO.

No. 87-759.

Plymouth.  May 13, 1988. — August 23, 1988.

Present: PERRETTA, DREBEN, & KASS, JJ.

*Armed Assault in a Dwelling. Assault and Battery by Means of a Dangerous Weapon. Witness, Bias. Evidence, Bias, Prior inconsistent statement. Practice, Criminal, Variance. Words, "Dwelling."*

At the trial of an indictment under G. L. c. 265, § 18A, there was sufficient evidence to warrant the jury's finding that the defendant was armed when he entered the dwelling in question, notwithstanding the defendant's testimony that he was not. [349-351]

Where the outcome of a criminal trial turned on the credibility of the victim and the defendant it was reversible error to exclude proffered testimony of two prospective defense witnesses as to alleged statements by the victim which were inconsistent with her testimony at trial and which showed that she had a motive to lie. [351-354]

At the retrial of an indictment under G. L. c. 265, § 18A, charging armed assault in a dwelling, the Commonwealth would be required to prove beyond a reasonable doubt that the dwelling in question was not that of the defendant, that is, that he had no right of habitation or occupancy in the dwelling at the time of entry, and the defendant, on his timely request, would be entitled to have the jury instructed to that effect. [354-357]

At the trial of an indictment framed under G. L. c. 265, § 18A (armed assault in a dwelling house with the intent to commit a felony), the judge properly charged the jury that, on the evidence presented, they could consider basing a guilty finding on the theory of assault with intent to kill or with intent to commit assault and battery by means of a dangerous weapon, and that they were not limited by language in the indictment specifying intent to murder. [357-358]

INDICTMENTS found and returned in the Superior Court Department on December 18, 1985.

The cases were tried before *Harry J. Elam*, J.

*Chrystal Murray,* Committee for Public Counsel Services, for the defendant.

*Linda M. Fleming,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. After a jury trial in the Superior Court, the defendant was found guilty on indictments charging him with armed assault within a dwelling with the intent to commit a felony and assault and battery by means of a dangerous weapon.[1] Because the judge excluded relevant evidence on the issue of the complaining witness's motive to lie, we reverse.

I. *The Evidence.*

There is no dispute that on November 7, 1984, the defendant shot his former wife, Janice Ricardo. At the time of the shooting, which the defendant claimed to be an accident, he and Janice had been divorced for about two years. Their marriage had lasted twenty-one years, and it appears from the evidence that it was the defendant who initiated the divorce proceedings.

Throughout most of the marriage the defendant, Janice, and their children, had resided in an apartment at 5 North Spooner Street, Plymouth. Janice remained in the apartment after the divorce, which did not end the relationship between her and the defendant. According to Janice's testimony, the defendant had been living with his sister after the divorce. However, frequently he would spend time with Janice at the North Spooner Street apartment. He had clothes and other personal belongings at the apartment, including five guns, three of which were always loaded. Sometimes, the defendant would spend the entire night at the apartment. As put by Janice, the defendant "came and went pretty much at random," he lived there "on and off," and he had keys to the apartment.

The defendant testified on his own behalf. His description of his living arrangement with Janice was consistent with her testimony, varying only in degree. He claimed he "lived" at North Spooner Street, although "[n]ot full time." He was at the apartment every day, sometimes leaving at midnight and

---

[1] The defendant was acquitted on a charge of assault with intent to murder.

sometimes spending the entire night. He stated that "[e]very-thing [he] owned" was at the apartment.

Access to the apartment through the back entrance involved three doors. There was a storm door which protected a "regular" door that opened into a mudroom. The third door led from the mudroom into the kitchen.

We relate the events leading up to the shooting, giving Janice's account first. The defendant came to the apartment on November 5, 1984. He and Janice had a loud argument, and he called her names. He left about 9:30 P.M., returned two hours later, took one of his shotguns from the bedroom, again called Janice names, and left the apartment with the gun.

Some time in the early afternoon of November 7, Janice came home from work after stopping to buy a new lock for the back door. She entered the apartment through the back and locked the doors behind her. She had passed through the kitchen when she heard "this big noise" and returned to that room. She saw the defendant standing between the kitchen table and stove. He was holding the shotgun.

Janice told the defendant to leave. She walked to the living room, telling him that she was going to call the police. The defendant followed her into the living room, reached around her, and put the telephone (a portable) down. Janice screamed to her niece, Deborah White, who lived in the adjoining apartment: "Debbie, get help. He's got a gun, he's going to kill me." [2] Janice testified that the defendant, who was about a foot away from her, then "raised the shotgun and he shot" her. The shot entered Janice's left breast, passed through her right breast, her handbag which was under her arm, and through her right arm.

After Janice fell to the floor, the defendant accused her of sleeping with the landlord. She asked the defendant three times to call for help, but he could only say, "I can't. I can't." The defendant was crying. At this point, Deborah White came into the apartment, told Janice that she had called the police, took

---

[2] The "big noise" which Janice heard was the defendant banging at the back door. Deborah White testified that she called the police when she heard the banging.

the shotgun, and returned to her apartment. When the police arrived in response to Deborah's earlier call, the defendant was on the telephone. He had called the police and told them that he had shot his wife.

According to the defendant, on the morning of November 7, he complied with his sister's order "to take that gun back home where it belonged." He put the gun, which was unloaded, in his truck and drove to the North Spooner Street apartment. It was about 10:00 A.M. The defendant took a nap on the couch for two hours while a friend borrowed his truck. The unloaded gun was still in the truck when his friend borrowed it. The friend returned about 12:30 P.M.. The defendant took the gun from the truck, placed it in the mudroom and went out for lunch.

After lunch, the defendant returned to the apartment to see if Janice had come home. He opened the storm door and banged on the second door leading into the mudroom. This door had been broken before, and when the defendant banged on it, it split. Once inside the mudroom, the defendant put his key in the door leading to the kitchen. When the door would not open, the defendant banged on this door also, calling to Janice. The door, which "was splitting in half already" opened. The defendant took the gun from the mudroom, intending to return it to the bedroom.

When the defendant entered the kitchen, he saw Janice standing there. She asked him what he was doing at the apartment, and he replied that he wanted to talk to her. She next asked about the gun, and the defendant said he was putting it back. He testified that he was "holding the gun with . . . [his] right hand, facing down."

As the defendant started towards the living room to go to the bedroom, Janice was in front of him. She turned, saw the defendant with the gun, and began screaming and "freaking out." She said she was going to call the police. The defendant stated that he told her that there was no need to do that and "[j]ust put the phone down." The defendant related that Janice put the phone down and then came at him. She was screaming and hitting him with her handbag in one hand and grabbing for the gun with her other hand. The defendant started to fall

backwards, and Janice grabbed the gun barrel. Each struggled for control of the gun, the defendant fell against the raised hearth of the fireplace, and the gun discharged.[3]

Other witnesses corroborated the defendant's version in some respects. When the police arrived, they found the defendant on the floor holding Janice in his arms. He told them that he "didn't mean to shoot her." He was "visibly upset," "crying," saying that he loved her, and repeatedly asking whether she would be "all right." The defendant's sister testified that she and Janice had been "very good friends" from the time Janice had married her brother. When the sister asked Janice how the shooting happened, Janice's explanation was consistent with the explanation given to her (and the jury) by the defendant.

Two of the three Ricardo children testified. The twenty year old daughter related that in June of 1985, she was having an argument with her mother. The daughter confronted her mother with the fact that she had heard that the shooting was an accident. The mother (Janice) then said that the only person she had ever told it was an accident was the defendant's sister. The son testified that the back door leading from the mudroom to the kitchen had been cracked before the incident in question. He knew that because he was the one who had cracked it. The door leading into the mudroom from the outside was in poor condition a few months before the incident. It was "[r]eal loose and cracked — if you wiggled it, the whole latches on the door were all loose and stuff." He described both doors as "pretty messed up all the time."

II. *Required Finding of Not Guilty*.

General Laws c. 265, § 18A, as appearing in St. 1969, c. 473, reads in pertinent part: "Whoever, being armed with a dangerous weapon, enters a dwelling house and while therein assaults another with intent to commit a felony shall be punished . . . ." The defendant claims that he was entitled to a required finding of not guilty on the indictment brought under § 18A, as there was insufficient evidence to show that he was armed

---

[3] The defendant stated that since the gun was unloaded when he put it in his truck, he was surprised when it discharged. He could only surmise that his friend had loaded the gun when he borrowed the truck.

when he entered the apartment just prior to the shooting. We need not recite the standard to be applied in considering the defendant's claim. See *Commonwealth* v. *Sandler*, 368 Mass. 729, 740 (1975); *Commonwealth* v. *Latimore*, 378 Mass. 671, 678 (1979); *Commonwealth* v. *Amaral*, 13 Mass. App. Ct. ·238, 239 (1982).

At the close of the Commonwealth's case, there was evidence to show that the defendant removed the shotgun from the apartment on November 5. On November 7, Janice came home from work, entered the apartment through the back doors, and locked them. She was in the living room when she heard loud banging on the back door. Returning to the kitchen, she encountered the defendant holding the shotgun.

Between the time of the close of its case and the close of all the evidence, the Commonwealth's proof did not deteriorate. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 n.1 (1976). The defendant argues that there was uncontroverted evidence (his testimony) to show that, when his friend returned with his truck, he removed the shotgun, put it in the mudroom, and went out to lunch. Hence, he claims, when he returned and entered the apartment, he was unarmed, as the shotgun was already in the apartment, the mudroom. The argument, however, overlooks the fact that the jury "are not required to accept or reject the statements of the defendant in their entirety; rather, the jury may believe such portions of the defendant's statements as they may consider trustworthy. *Commonwealth* v. *McInerney*, 373 Mass. 136, 141-144 (1977). *Commonwealth* v. *Goldenberg*, 315 Mass. 26, 30 (1943)." *Commonwealth* v. *Amazeen*, 375 Mass. 73, 80 n.5 (1978).

There was evidence offered by the Commonwealth to show that the shotgun held a total of five shells, four shells in the magazine and one shell in the chamber. Immediately after the shooting, the police retrieved the shotgun from Deborah White and ejected one spent round and four loaded rounds from the gun. They also found an empty shotgun case in the front seat of the defendant's truck. Even if the jury believed the defendant's testimony that his friend must have loaded the shotgun when he borrowed the truck, they nonetheless could disbelieve

his testimony that, upon the friend's return, he (the defendant) took the shotgun, leaving the case behind, and placed it in the mudroom intending to return it to the bedroom in the apartment after lunch. We think the evidence sufficient to warrant a reasonable inference that when the defendant returned to the apartment after lunch and at a time when Janice was due home from work, he took the shotgun from the truck and entered the apartment. We see no error in the denial of the defendant's motion for a required finding of not guilty made at the close of the Commonwealth's case and renewed at the close of the evidence.

III. *Bias and Motive to Lie.*

It was made clear to the jury from the outset, through opening statements, that the issue before them would be whether Janice had been shot intentionally or accidentally. The prosecutor stated that there would be evidence to show that Janice heard banging on the back doors, went into the kitchen, saw the defendant with a shotgun, and spoke briefly with him. She then started backing into the living room screaming at the defendant. When he was close to her so that the barrel of the shotgun was no more than a foot away, he "pulled the trigger" and accused her of sleeping with the landlord.

Defense counsel delivered an opening statement immediately following that of the prosecutor. Among other statements that he made, were: (1) "The defense is that the shooting was accidental"; (2) "The evidence that we intend to present to you will include the testimony of at least one if not two people to whom Janice Ricardo admitted that this was [an] accident"; and (3) "We will present evidence that Janice Ricardo said to David, '[y]ou divorced me and you're going to pay.'"

As earlier recited, it was Janice's direct testimony that the defendant intentionally shot her, that as he stood close to her he "raised the shotgun and he shot" her. On cross-examination, Janice denied that she grabbed the gun ("I didn't touch that gun at all"), and when asked if she had told anyone that the shooting was an accident, she replied, "I have not ever said it was an accident." More specifically, she denied having told her daughter that the shooting was an accident, and she testified

that she "never said" to the defendant "[a]ccident or no accident, you divorced me, and you're going to pay for that."

After the Commonwealth rested its case, the defendant indicated that he intended to call two witnesses to testify to having overheard Janice yelling at the defendant at his place of employment, a restaurant where the witnesses also worked. The judge called for an offer of proof. Defense counsel stated that, if allowed to testify, the witnesses would relate that, one day in July or August of 1985, Janice came into a back room of the restaurant where the witnesses and the defendant were working. Janice began screaming and yelling at the defendant, telling him two or three times, "accident or no accident, you divorce me and you're going to pay for it." The defendant urged her to calm down. Defense counsel also advised the judge that the Ricardo daughter would be called to testify. Her testimony would be that, during an argument with her mother, she (the daughter) stated, " 'I heard it was an accident,' " and Janice replied that the "only person I told it was an accident was your father's fat sister.' "

In arguing that the two restaurant employees should be allowed to relate what they had heard Janice say to the defendant, defense counsel gave two bases for the admissibility of the testimony: that they were prior inconsistent statements, and that they tended to show a motive on Janice's part to lie. The Commonwealth opposed admission of the evidence on the ground that there was no link between what the witnesses overheard and what was meant by the statement. As put by the prosecutor: " 'accident or no accident' — I don't know what that means."

Although the judge voiced concern that the witnesses could not give a more specific date of the incident at the restaurant, he appears to have excluded the evidence on the ground that Janice made the statements to the defendant and not the witnesses. The witnesses only heard "some statement about accident or no accident, you're going to pay for it." Immediately thereafter, either in amplification or clarification of the earlier ruling, the judge concluded that the offered testimony of the two witnesses was "too remote and there is not enough that's being

said to relate what was said at that time back to . . . to contradict anything that . . . [Janice] said." He reserved his ruling concerning the testimony of the Ricardo daughter until she was called to testify. After the defendant's sister testified to her conversation with Janice, defense counsel inquired of the judge whether, based upon the earlier offer of proof, the daughter could relate her conversation with her mother (Janice). The judge ruled that the daughter could relate her conversation with her mother to the jury.

Exclusion of the testimony of the two restaurant employees was error. That testimony was admissible for the reasons stated by defense counsel — to show that Janice had made prior statements inconsistent with her testimony at trial and that she had a motive to lie. We quote at length from *Commonwealth v. Hesketh*, 386 Mass. 153, 160-161(1982):

> "As a matter of right, a defendant is entitled to reasonable cross-examination of witnesses to show bias or prejudice. *Commonwealth v. Russ*, 232 Mass. 58, 79 (1919). The correlative rule is that 'the scope of cross-examination, including to what extent the accuracy, veracity, and credibility of a witness may be tested, rests largely in the sound discretion of the judge, not subject to revision unless prejudice is shown to a party by reason of too narrow restriction or too great breadth of inquiry.' *Commonwealth v. Smith*, 329 Mass. 477, 479 (1952). However, 'it is not necessary that there should be a contradiction in plain terms. It is enough if the proffered testimony, taken as a whole, either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the witness whom it is sought to contradict.' *Commonwealth v. West*, 312 Mass. 438, 440 (1942). The wide discretion of the trial judge 'has no application where alleged contradictory statements of a witness relate to the main issue that is being tried.' *Commonwealth v. A Juvenile*, 361 Mass. 214, 218 (1972). Where, however, as here the statements are not plainly contradictory, the judge has wide discretion."

As we read the testimony of Janice in its entirety (her account of the shooting and her denials that she ever said it was an accident), the excluded evidence would have been a plain contradiction of her testimony on the main issue before the jury. Indeed, the Commonwealth viewed the claim of accident as being of sufficient importance to recall Janice on rebuttal to deny the testimony of her daughter and sister-in-law.

Moreover, the excluded evidence goes beyond the testimony of the daughter and the sister-in-law. The Commonwealth brought out on cross-examination of the daughter that Janice's supposed statement to her was made during an argument between the two. The testimony of the sister-in-law could be viewed with caution because of her relation to the defendant. On the other hand, if believed, their testimony shows only a conflict between Janice's earlier statements and her testimony at trial. The testimony of the daughter and the sister-in-law affords no explanation as to why Janice might lie. The statement of Janice to the defendant, overheard by the two employees, affords that explanation. That statement to which the two witnesses would have testified is consistent with Janice's earlier statements to her daughter and sister-in-law and, if believed, shows that Janice had a motive to lie.

This trial was a contest of credibility between Janice and the defendant. There must be a new trial. See *Commonwealth v. Henson*, 394 Mass. 584, 586-587 (1985); *Commonwealth v. Aguiar*, 400 Mass. 508, 513-514 (1987); *Commonwealth v. Piedra*, 20 Mass. App. Ct. 155, 156-158 (1985).

IV. *Issues Likely to Recur*.

There are certain issues which are likely to recur at any retrial of the defendant. We, therefore, consider those claims.

(a) *Armed assault within a dwelling*. General Laws c. 265, § 18A, provides in full: "Whoever, being armed with a dangerous weapon, enters a *dwelling house* and while therein assaults another with intent to commit a felony shall be punished by imprisonment in the state prison for life, or for a term of not less than ten years. No person imprisoned under this section shall be eligible for parole in less then five years" (emphasis supplied). The indictment reads, in pertinent part, that the defendant "did enter the dwelling house of Janice Ricardo . . . ."

At common law, one could not burglarize his own dwelling. See 2 LaFave & Scott, Substantive Criminal Law § 8.13, at 464, 470 (1986); Nolan, Criminal Law § 401 & § 404 (1976); Perkins & Boyce, Criminal Law 246, 261-262 (3d ed. 1982). The common law concept of dwelling is one of habitation, that is, a "place of habitation," *id.* at 256, or "a place to sleep in." *Commonwealth* v. *Correia*, 17 Mass. App. Ct. 233, 235 (1983), quoting from Nolan, *supra* at § 404. In determining whether a common law dwelling house is that of a defendant or another, the "controlling question is occupancy rather than ownership." Perkins & Boyce, *supra* at 261. See 2 LaFave & Scott, *supra* at 470 & n.71. See also *People* v. *Gauze*, 15 Cal.3d 709, 714 (1975), distinguishing *People* v. *Sears*, 62 Cal.2d 737, 746 (1965), on the basis of "possessory rights" of habitation. Cf. *People* v. *Insogna*, 86 A.D.2d 979 (N.Y. App. Div. 1982) (second degree burglary required proof that a defendant "knowingly entered or remained unlawfully in or upon premises, i.e., that he was not licensed or privileged to be there"); Model Penal Code and Commentaries § 221.1, at 68 (1980) (discussing "unprivileged entry" as an element of burglary).

There was evidence presented on which it could be found as matter of fact that Janice's apartment was also a place of habitation for the defendant. If that were found to be so, then the defendant would be entitled to be found not guilty on the indictment framed under § 18A if the phrase "a dwelling house" used therein incorporates the common law definition.

The Commonwealth argues that by its clear and express language, § 18A speaks to any dwelling house and, therefore, includes the dwelling house of the defendant. It contends that because burglary is a possessory crime, the only instances in which it might be appropriate to view § 18A as analogous to a burglary statute would be where the underlying felony that a defendant intends to commit once within the dwelling is a crime against property, such as larceny, rather than a crime against the person, such as assault and battery by means of a dangerous weapon.

Even assuming that the Commonwealth's argument presents a reasonable method of statutory construction, the argument

overlooks the language of the statute which does not require an intent to commit a felony at the time of the entry into the dwelling house. The "intent to commit a felony" is directed to the assault of another in the dwelling. Further, as stressed by the above-cited commentators, burglary is not a possessory crime. To the extent burglary has been classified by statute as a crime against property, it is because common law burglary has been expanded by statutes to punish invasion into structures other than dwellings, i.e., ships, automobiles, railroad cars. Nolan, *supra* at § 401.

As stated in Perkins & Boyce, *supra* at 246, "[w]hile legislative extensions have been such that no label will be entirely free from question, the social interest here protected may best be identified by referring to . . . [arson and burglary] as 'offenses against habitation and occupancy.' " The fact that § 18A does not require that the entry be made in the nighttime and with the intent to commit a felony does not change the essence of the offense, the invasion of a dwelling under circumstances so likely to terrorize occupants as to justify the increment in the punishment. See Model Penal Code and Commentaries, *supra*, § 221.1, at 59.

Although the Legislature has enlarged and redefined from time to time the common law crimes of arson and burglary, the phrase "a dwelling house" appears undefined throughout burglary statutes. See, e.g., G. L. c. 266, §§ 14, 15 & 18. That phrase, however, has been construed to mean a dwelling (or building, as the case may be) of another or other than one's own. See *Commonwealth* v. *Kalinowski*, 360 Mass. 682, 684 (1971); *Commonwealth* v. *Lawrence*, 11 Mass. App. Ct. 990, 991 (1981). By not defining the term "a dwelling house" in the burglary statutes, the Legislature is presumed to have intended to incorporate the common law definition of that phrase, "at least in so far as it is not inconsistent with the terms or the purpose of the statute." *Commonwealth* v. *Burke*, 390 Mass. 480, 484-485 (1983), citing *Commonwealth* v. *Slaney*, 345 Mass. 135, 138 (1962). In this respect we note that, in codifying the common law crime of arson (the "malicious burning of the dwelling of another," Perkins & Boyce, *supra* at 273), the

Legislature used clear and express language to modify the common law definition of a dwelling house. See G. L. c. 266, § 1, as appearing in St. 1948, c. 43, § 1 ("Whoever willfully and maliciously sets fire to, burns, or causes to be burned . . . a dwelling house or a building adjoining or adjacent to a dwelling house, or a building by the burning whereof a dwelling house is burned, whether such dwelling house or other building is the *property of himself or another* . . ." [emphasis supplied]).

In sum, at any retrial of the defendant on the indictment under § 18A, the Commonwealth must prove beyond a reasonable doubt that the dwelling house in question (the apartment) was not that of the defendant, that is, that he had no right of habitation or occupancy in the apartment at the time of the entry. If the case is tried to a jury, and the defendant makes a timely request pursuant to Mass.R.Crim.P. 24(b), 378 Mass. 895-896 (1979), he will be entitled to an appropriate instruction to that effect.[4]

(b) *Alleged variance.* Of the numerous remaining claims of error in the jury instructions, there is only one which we think might recur. As worded, the indictment under § 18A charges, in part, that the defendant assaulted Janice with the intent to murder her. In instructing the jury on that portion of the indictment, the judge told the jury that they were not limited to that felony in their deliberations, that evidence had been introduced which allowed them also to consider whether the defendant assaulted Janice with the intent to kill her or with the intent to commit an assault and battery by means of a dangerous weapon. The judge's decision to instruct on those offenses is supported by two theories, (1) that the other offenses were lesser included offenses of assault with intent to murder, and (2) that the specification in the indictment of assault with intent to murder was mere surplusage so that the judge's instruction

---

[4] In instructing the jury on this element of the offense set out in § 18A, the judge stated that the Commonwealth was required to prove beyond a reasonable doubt that the defendant assaulted Janice in "a dwelling house." No objection was taken to that instruction, which failed to put to the jury the question considered by us on a claim of a substantial risk of a miscarriage of justice.

did not highlight a "true variance" between indictment and proof.[5] See *Commonwealth* v. *Henson*, 394 Mass. 584, 590-592 (1985), and *Commonwealth* v. *Costello*, 392 Mass. 393, 402-404 (1984), respectively. The judgments of conviction are reversed and the verdicts set aside.

*So ordered.*

---

[5] Requests for jury instructions were not filed, and no objections to the instructions were taken. Although there are serious problems with the instructions on the elements of these offenses, we think that these issues can be avoided at any retrial by compliance with rule 24(b), *supra*.