USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1990 JOHN VEIGA, Plaintiff, Appellant, v. JOHN MCGEE, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Mark L. Wolf, U.S. District Judge] ___________________ ____________________ Before Torruella, Selya and Stahl, Circuit Judges. ______________ _____________________ Deval L. Patrick, with whom Michael D. Ricciuti, Reginal C. ________________ ___________________ ___________ Lindsay, and Hill & Barlow, were on brief for appellant. _______ _____________ John P. Roache, with whom Hogan, Roache & Malone, was on ______________ _______________________ brief for appellee. ____________________ June 22, 1994 ____________________ TORRUELLA, Circuit Judge. This appeal requires us to ______________ determine the meaning of the term "disorderly" as used in the Massachusetts Alcoholism Treatment and Rehabilitation Act ("Chapter 111B"), generally known as the Protective Custody Law, Mass. Gen. L. ch. 111B, 11 et seq., and whether the district _______ court appropriately charged the jury as to the standard for determining if the conduct of appellant John Veiga ("Veiga"), during the early morning hours of December 6, 1987, provided a basis for police officers reasonably to conclude that he was "incapacitated" within the meaning of that statute. BACKGROUND BACKGROUND __________ At approximately 2:00 a.m. on December 6, 1987, appellant John Veiga, a 23-year-old medical student at Boston University School of Medicine, was with a friend, Jessica Goldhirsch ("Goldhirsch"), in the front seat of Goldhirsch's car when Officers John McGee and David Johnson, who were on routine patrol, drove by and noticed the car. The car was parked a few feet behind several stores in an otherwise deserted parking lot near the corner of Dudley and Belden streets in Boston. Near the parking lot were a few occupied homes and apartment buildings. Upon noticing the car, Officer Johnson pulled the police wagon he was driving into the parking lot and turned the "take-down" lights (a set of bright lights) on Goldhirsch's car. Officer McGee then alighted from the vehicle, approached the passenger side of Goldhirsch's car with a lighted flashlight, and shined the light into the car. He proceeded to inquire as to the -2- ownership of the car. Goldhirsch, who had driven the car to the parking lot and was sitting in the driver's seat, produced her license and the registration, while Veiga remained seated quietly in the passenger seat of Goldhirsch's car. After Officer McGee determined that Goldhirsch's papers were in order and gave her back her license and registration, the officer walked over to the passenger's side of the car and asked Veiga for identification. Veiga responded by asking why Officer McGee wanted to know his name. According to the police officers, Veiga's response was loud and boisterous. Officer McGee again asked Veiga to show him some identification. Veiga opened the car door, got out, and said he would not give McGee any information. Officer McGee testified that he asked Veiga six more times by saying "Sir, I just want to see some identification. I just want to know who you are, why you're here," and Veiga responded similarly by asking loudly why the police were asking him questions, and what he had done wrong. At trial, the officers testified that Veiga was "ranting and raving" and protesting that the police had no right to ask him any questions. This entire colloquy lasted four or five minutes.1 Eventually, Officers McGee and Johnson handcuffed Veiga, and as they were doing this, informed him that he was ____________________ 1 At trial, Officer Johnson admitted that Veiga was not profane, that he did not call the officers names, and that McGee did not have to raise his voice to be heard over Veiga. Officer McGee also admitted that Veiga was rational and coherent. -3- being placed in protective custody.2 They then led Veiga into the police wagon and drove him to the station. Veiga did not resist being handcuffed or being led into the wagon. The officers maintain that during their encounter with Veiga, he was unsteady on his feet, gesturing with his arms, that his speech was slurred and that he was emitting an odor of alcohol from his person and his breath.3 At the station, Veiga denied that he had been drinking and said that the officers had no reason to take him to the station and no reason to ask him who he was and why he was in the parking lot. At the station, Officer McGee spoke with Goldhirsch and informed her that the police were going to hold Veiga at the station. Veiga was placed in a cell with another person and released at approximately 8:OO o'clock that morning. Veiga subsequently brought this action against Officers McGee and Johnson, and against the City of Boston (the "City"). In his complaint, Veiga alleged that the officers violated his rights under the United States Constitution and state law by ____________________ 2 At trial, Officers McGee and Johnson both admitted that they did not suspect either Goldhirsch or Veiga of any specific criminal activity that night. 3 Whether the police officers had a reasonable basis for concluding that Veiga was intoxicated was a highly contested issue at trial. Veiga contends that he did not consume any alcoholic beverages between the evening of December 5 and the early morning hours of December 6. The record contains substantial evidence that while at the medical school on December 5, Veiga studied histology and dissected a cadaver and that these activities brought him into contact with several chemicals, including acetone, which could have accounted for odors emitting from his body. -4- seizing him without justification. Specifically, Veiga sued Officers McGee and Johnson under 42 U.S.C. 1983 for violations of his federal civil rights, including his First Amendment right to freedom of expression and his Fourth Amendment right to be free from unlawful seizure. Veiga also brought claims for battery; for false imprisonment; and for infliction of emotional distress. Veiga also sued the City for negligence under the Massachusetts Tort Claims Act, Mass. Gen. L. ch. 258.4 At trial, both Officers Mcgee and Johnson testified that they told Veiga he could take a breathalyzer examination and that if he passed the test, he would be released. According to Officer Johnson, Veiga replied that he was not drunk, that the police were going to have to prove he was drunk, and that he would not take any test. The officers further maintain that Veiga refused to sign the protective custody form in the space labeled "I was informed of my right to a breathalyzer test." Veiga testified that he was never informed of his right to take a breathalyzer test.5 ____________________ 4 Veiga also raised other civil rights claims against the City based on various alleged customs, policies and practices. The Court sua sponte severed these claims for a separate trial. ___________ These claims are not part of this appeal. 5 Chapter 111B, 8 provides in part: Any person assisted by a police officer to a police station shall have the right, and be informed in writing of said right, to request and be administered a breathalyzer test. . . . If any person who is administered a breathalyzer test, under this section, and evidence from said test indicates that the percentage -5- The jury specifically found that the officers failed to inform Veiga of the reasons he was regarded as incapacitated and of what he would have to do to be released from protective custody. On all charges, however, the jury found in favor of Officers McGee and Johnson and the City of Boston.6 The ____________________ of alcohol in his blood is more than five one hundredths there shall be no presumption made based solely on the breathalyzer test. In such instance a reasonable test of coordination or speech coherency must be administered to determine if said person is intoxicated. Only when such test of coordination or speech coherency indicates said person is intoxicated shall he be placed in protective custody at a police station or transferred to a facility. 6 The jury answered the special verdict form as follows: (1) Was John Veiga put in protective custody without a reasonable basis to believe he was incapacitated? "No"; (2) Has John Veiga proven that the exercise of his right not to answer questions and/or his right to oppose verbally, the actions of the police was a substantial factor in the decision to place him in protective custody? "No"; (3) Was a battery committed on John Veiga? "No"; (4) Was excessive force used on John Veiga? "No"; (5) Did either or both defendants intentionally cause John Veiga emotional distress? "No"; (6) Did one or more police officers acting individually or jointly, negligently deprive John Veiga of his right to (a) be administered a breathalyzer test? "No"; (b) be released from protective custody when there was no longer a reasonable basis to believe he was incapacitated? "No"; (7)(a) Did John McGee or David Johnson fail to inform John Veiga of the reasons he was regarded as incapacitated and what -6- district court subsequently denied Veiga's "Motion For a Judgment as a Matter of Law or, in the Alternative, for a New Trial." On appeal, Veiga contends that he is entitled to judgment in his favor. Alternatively, he contends that errors in the district court's instructions to the jury entitle him to a new trial. THE PROTECTIVE CUSTODY LAW THE PROTECTIVE CUSTODY LAW __________________________ Under Chapter 111B, "[a]ny person who is incapacitated may be assisted by a police officer with or without his consent to his residence, to a facility or to a police station." Mass. Gen. L. ch. 111B, 8. In its definitional section, the law defines "incapacitated" as "the condition of an intoxicated person who, by reason of the consumption of intoxicating liquor is (1) unconscious, (2) in need of medical attention, (3) likely to suffer or cause physical harm or damage property, or (4) disorderly." Mass. Gen. L. ch. 111B, 3. Thus, under Chapter 111B, in order to take a person into protective custody, the police must believe that he is both intoxicated and either ____ ___ unconscious, in need of medical attention, likely to suffer or cause physical harm or damage, or disorderly. Veiga maintains that Officers McGee and Johnson unlawfully detained him in violation of the First and Fourth Amendments to the United States Constitution. On appeal, Veiga ____________________ he would have to do to be released from protective custody? "Yes"; and (7)(b) If you answered Question 7(a) "Yes," did John McGee or David Johnson intentionally fail to give John Veiga this information? "No." -7- contends that the district court erred by improperly instructing the jury as to the meaning of the term "disorderly", as that term is used in the Protective Custody Law. See infra p. 14. He ___ _____ argues that the district court's erroneous definition of the term "disorderly" permitted the jury to approve Veiga's seizure by Officers McGee and Johnson simply because he objected loudly to their questioning of him. He contends that this definition represents a departure from Massachusetts law which excludes speech and expressive conduct from the definition of "disorderly," and that the definition is, furthermore, unconstitutional as violative of the First Amendment. We decide this case on Fourth Amendment and state statutory grounds rather than on First Amendment principles. In interpreting Chapter 111B we defer to state court decisions, recognizing that "[t]he Supreme Judicial Court, not this court, is the authoritative interpreter of state statutes." Sabetti v. _______ DiPaolo, 16 F.3d 16, 19 (1st Cir. 1994); Rundlett v. Oliver, 607 _______ ________ ______ F.2d 495, 500 (1st Cir. 1979). A. Meaning of the term "disorderly" under Massachusetts law A. Meaning of the term "disorderly" under Massachusetts law Well-established principles of statutory construction dictate that when a statute includes a term well-known to the common law, courts should presume that the legislature intended the term to be interpreted as in the common law. "[T]he interpretation of well-defined words . . . in the common law carries over to statutes dealing with the same or similar subject matter. . . . Furthermore, common-law meanings are assumed to -8- apply even in statutes dealing with new and different subject matter, to the extent that they appear fitting and in the absence of evidence to indicate contrary meaning." 2B N. Singer, Sutherland Statutory Construction 50.03 at 103 (5th ed. 1992); _________________________________ see also Mass. Gen. L. ch. 4, 6 ("[w]ords and phrases shall be ________ construed according to the common and approved usage of the language; but technical words and phrases and such others as may have acquired a peculiar and appropriate meaning in law shall be construed and understood according to such meaning"). The term "disorderly" is not defined anywhere in Chapter 111B. Nevertheless, the term "disorderly" has a long common law heritage. See Alegata v. Commonwealth, 353 Mass. 287, ___ _______ ____________ 302, 231 N.E.2d 201, 210-11 (1967) (the statute prohibiting disorderly conduct "has had a long history, dating from the early 17th century" and "recent case law and legal scholarship have narrowed the scope of the prohibition"). By not defining the term in the statute, "the Legislature is presumed to have intended to incorporate the common law definition . . . at least insofar as it is not inconsistent with the terms or the purpose of the statute." Commonwealth v. Ricardo, 26 Mass. App. Ct. 345, ____________ _______ 356, 526 N.E.2d 1340, 1347 (1988) (internal quotation and citations omitted). Massachusetts courts have defined the term "disorderly" in other contexts. In Alegata, 353 Mass. at 303, 231 N.E.2d at _______ 210-11, the Supreme Judicial Court of Massachusetts, interpreting the term "disorderly" within the meaning of the Massachusetts -9- statute providing for criminal punishment of disorderly persons, Mass. Gen. L. ch. 272, 53, approved the following Model Penal Code definition of the offense of disorderly conduct for use in Massachusetts: A person is guilty of disorderly conduct if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (a) engages in fighting or threatening, or in violent or tumultuous behavior; or (b) makes unreasonable noise or offensively coarse utterance, gesture or display, or addresses abusive language to any person present; or (c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor. Id. ___ In Commonwealth v. A Juvenile, 368 Mass. 580, 334 ____________ ___________ N.E.2d 617 (1975), the Supreme Judicial Court of Massachusetts, interpreting the same statute, significantly limited the definition of "disorderly" by striking subsection (b) from the Model Penal Code language imported by Allegata into 53. The ________ court did so because it found that the "portion of 53 which may be applied to 'unreasonable noise or offensively coarse utterance, gesture or display, or . . . [addressing] abusive language to any person present'" was unconstitutionally overbroad. A Juvenile, 368 Mass. at 586, 334 N.E.2d at 622. ___________ Specifically, the court found subsection (b) constitutionally untenable because it was "not sufficiently narrowly and precisely drawn to ensure that it reach only that speech which the state has a justifiable and compelling interest in regulating." Id. ___ -10- After striking subsection (b), the court concluded that "as reaching to conduct (other than expressive conduct), the . . . [remaining] provision is neither unconstitutionally overbroad nor vague." Id. The court further stated: ___ [I]n order to ensure that the statute as limited not be susceptible of application to conduct which is expressive and therefore protected by the First Amendment, we further construe the section to relate exclusively to activities which involve no lawful exercise of a First Amendment right. In this regard the intent to cause, or reckless disregard of, public inconvenience, annoyance, or alarm must be assessed in terms of whether the conduct was engaged in with intent to exercise a First Amendment right and whether the interest to be advanced is insignificant in comparison to the inconvenience, annoyance, or alarm caused. Id. at 628 (citation omitted); see also Commonwealth v. ___ __________ ____________ Feigenbaum, 404 Mass. 471, 473, 536 N.E.2d 325, 327 (1989) __________ (reaffirming these principles); Commonwealth v. Richards, 369 ____________ ________ Mass. 443, 445, 446 n.2, 340 N.E.2d 892, 896 n.2 (1976) (expressive conduct cannot be sanctioned as disorderly conduct). Appellees contend that the definition of "disorderly" as used in non-penal Chapter 111B is not the same definition of "disorderly" applied to the criminal statute, Mass. Gen. L. ch. 272, 53, as enunciated in A Juvenile. They argue that ___________ under Chapter 111B, "disorderly" may include making unreasonable noise late at night in a residential neighborhood. Moreover, they contend that Veiga's reliance on the definition of the crime of disorderly conduct as narrowed from the Model Penal Code -11- definition in A Juvenile is misplaced because Veiga was neither __________ arrested nor charged with the crime of disorderly conduct under Mass. Gen. L. ch. 272, 53. Appellees' argument is not persuasive for at least two reasons. First, in the absence of a statutory definition of a term, the understanding of that term in an analogous statute is an excellent guide to interpretation. See, e.g., Burno v. ___ ____ _____ Commissioner of Correction, 399 Mass. 111, 120, 503 N.E.2d 16, 22 __________________________ (1987); Donnelly v. Contributory Retirement Appeal Bd., 15 Mass. ________ ___________________________________ App. 19, 22, 443 N.E.2d 416, 418 (1982). The fact that one statute is formally classified as penal, whereas the other is not, does not detract from the former's value as a guide to the latter, or vice versa, so long as the two statutes are genuinely analogous in substance and effect. Cf. 2B Sutherland Statutory ___ _____________________ Construction, supra, at 51.03 ("Characterization of the object ____________ _____ or purpose is more important than characterization of subject matter in determining whether different statutes are closely enough related to justify interpreting one in light of the other."). The relationship between the two statutes we construe in pari materia today is a very close one. Chapter 111B replaced __ ____ _______ prior laws which provided for criminal punishment of public inebriants.7 In place of punishment, Chapter 111B provides for ____________________ 7 Section 18, Acts 1971, Ch. 1076, provides as follows: Any existing ordinance, by-law, resolution or other legislation of a county, municipality or other -12- the treatment and rehabilitation of alcoholics and evidences a concern for the health and safety of persons incapacitated by the effects of alcohol.8 The law accomplishes two objectives. First, Chapter 111B attempts to get intoxicated individuals who engage in disorderly conduct off the streets, protecting the public until they sober up -- a goal previously accomplished by criminal statutes. Second, Chapter 111B looks out for the health and safety of those individuals, attempting to protect incapacitated persons from themselves. Despite its non-penal objectives, the effect of Chapter 111B is, nevertheless, to deprive the allegedly incapacitated person of his or her liberty, ____________________ jurisdiction within the commonwealth establishing the offense of public intoxication or any equivalent offense is hereby repealed. No county, city, town or other political subdivision of the commonwealth shall adopt any law, ordinance, by-law, resolution or regulation having the force of law which provides that public intoxication or being found in any place in an intoxicated condition shall constitute an offense, a violation of the subject of criminal or civil penalties or sanctions of any kind or in any way inconsistent with the provisions of chapter one hundred and eleven B of the General Laws. 8 Chapter 111b, 7 provides for examination by a physician if there is any concern about the health or immediate treatment needs of an incapacitated person and section 4 contains the following language: The department [of Health] shall coordinate matters affecting alcoholism in the commonwealth, shall establish and conduct a program for the treatment of intoxicated persons and alcoholics . . . their rehabilitation and the prevention of alcoholism . . . . -13- by permitting detention at a police station. There is a second reason that appellees' argument fails. Were we to find that Chapter 111B's definition of "disorderly" does not incorporate a narrow definition like the definition established by Massachusetts case law, Chapter 111B would be unconstitutionally vague because "disorderly" is not otherwise clearly defined by the statute. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." Grayned v. City of _______ _______ Rockford, 408 U.S. 104, 108 (1972). "[I]f arbitrary and ________ discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." Id. In the ___ absence of clear legislative intent, we will not adopt an interpretation of a statute that would render it constitutionally suspect. United States v. Thompson, 452 F.2d 1333, 1337 (D.C. _____________ ________ Cir. 1971), cert. denied, 405 U.S. 998 (1972); see also Alegata, ____________ ________ _______ 353 Mass. at 290, 231 N.E.2d at 203 (a "statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score") (citation and internal quotation omitted). For the foregoing reasons, we find that the term "disorderly" should be interpreted in accordance with the definition given that term by the Supreme Judicial Court of Massachusetts in the case of A Juvenile and its progeny. __________ B. Jury instructions B. Jury instructions The district court instructed the jury as to the term -14- "disorderly" as follows: Whether a person is disorderly depends on his conduct and the time, place and _________________ manner of his speech . . . ____________________ . . . For the purpose of this case, however, the law does not allow police officers to take the content of what was said into account in deciding whether Mr. Veiga was disorderly. More specifically, in this case Mr. Veiga was engaged in disorderly conduct if when a person causes public inconvenience, annoyance or alarm or acting recklessly to create a risk of public inconvenience, annoyance or alarm he engaged in what is called multiple behavior. In this context recklessness means acting with a conscious disregard of substantial and unjustifiable risk of public inconvenience, annoyance or alarm. Multiple behavior is excessively unreasonable annoyance which creates a public nuisance. This would include ____________________ excessively unreasonable noise late at _________________________________________ night in a residential neighborhood so _________________________________________ that people in the privacy of their homes _________________________________________ are unable to avoid that noise. ______________________________ You may include all of the facts and circumstances of this case, including the reasons for any noise in deciding whether it was, among other things, excessively unreasonable. . . . It would be unlawful for the police officers to detain Mr. Veiga for refusing to answer their questions or for challenging them. They could, however, take into account his conduct and the ___ manner in which he expressed himself but _____________________________________ not the content of what he said or the language that he used in deciding whether he was incapacitated. -15- (Emphasis added).9 The district court correctly instructed the jury that "[i]t would be unlawful for the police officers to detain Mr. Veiga for refusing to answer their questions or for challenging them." See Houston v. Hill, 482 U.S. 451, 461 (1987) ("the First ___ _______ ____ Amendment protects a significant amount of verbal criticism and challenge directed at police officers"); Norwell v. Cincinnati, _______ __________ 414 U.S. 14 (1973) (per curiam) (reversing conviction for ___________ disorderly conduct where defendant was "loud and boisterous," stating that a person "is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer"). The district court's definition of "disorderly," however, would permit a jury to find that persons are "disorderly" based solely on the manner in which they express themselves. This definition contravenes A Juvenile, in which the __________ Massachusetts Supreme Judicial Court expressly excised from "disorderly" analysis both "speech and expressive conduct." A _ Juvenile, 368 Mass. at 593, 334 N.E.2d at 625. After all, if the ________ SJC thought that protected speech uttered in a loud voice could lawfully be regulated, then it would not have felt compelled to extricate the "mak[ing of] unreasonable noise" from the definition of disorderly. The district court's definition also contravenes ____________________ 9 Following the jury instructions, counsel for Veiga objected to the court's definition of "disorderly" properly preserving this issue for appeal. -16- Massachusetts court interpretations of the term "tumultuous behavior" of subsection (c) of the Model Penal Code definition of "disorderly." Massachusetts courts have upheld convictions for disorderly conduct only where "defendants' conduct -- independent _______ of any speech or expressive conduct --" warranted the conviction. Commonwealth v. Carson, 411 N.E.2d 1337 (Mass. App. Ct. 1980); ____________ ______ see also Richards, 340 N.E.2d at 896 ("evidence that the ___ ____ ________ defendants engaged in fighting and violent or tumultuous behavior, entirely apart from any speech of theirs [warranted submission of disorderly conduct complaints] to the jury with instructions, inter alia, that the speech of the defendants was not to be considered as evidence of guilt"); United States v. _____________ Pasqualino, 768 F. Supp. 13 (D. Mass. 1991) (rejecting contention __________ that person was "unruly and tumultuous" where arrest was grounded solely on the conclusion that the defendant was loud, and, consequently, that he created a disturbance). In any event, Veiga's behavior cannot conceivably be brought within the SJC's careful definition of tumultuous behavior as "involving riotous commotion and excessively unreasonable noise so as to constitute a public nuisance." A Juvenile, 334 N.E.2d at 628. __________ Moreover, by instructing the jury that "disorderly" included creating "excessively unreasonable noise late at night in a residential neighborhood so that people in the privacy of their homes are unable to avoid that noise," the court improperly imported into the definition of "disorderly" elements of the offense of disturbing the peace. In criminal law, the crime of -17- disturbing the peace is distinct from that of disorderly conduct. Mass. Gen. L. ch. 272, 53; Alegata, 353 Mass. at 302, 231 _______ N.E.2d at 210 ("Section 53 explicitly differentiates 'idle and disorderly' from 'disturbers of the peace.'"). Under Massachusetts law, speech alone does not constitute "disorderly" conduct and Chapter 111B does not authorize police to take into protective custody "disturbers of the peace." See supra note 7. ___ _____ -18- THE FOURTH AMENDMENT THE FOURTH AMENDMENT ____________________ The Fourth Amendment entitles an individual to "the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Terry v. Ohio, 392 U.S. 1, 9 (1967) (quoting _____ ____ Union Pac. R. Co. v. Botsford, 141 U.S. 250, 251 (1891)). The __________________ ________ Supreme Court has stated that "this inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study . . . ." Terry, _____ 392 U.S. at 9. Unquestionably, Veiga was entitled to the protection of the Fourth Amendment as he stood in the parking lot in Boston. Id. __ In order to justify "official intrusion upon the constitutionally protected interests of the private citizen . . . the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 _____ U.S. at 21 (internal quotation and citations omitted). It is well established that "the police [may] not interfere with the freedom of private persons unless it be for specific, legitimate reasons." Duran v. Douglas, 904 F.2d 1372, 1376 (9th Cir. 1990) _____ _______ (citation omitted). In the present case, the officers have offered no common-law ground for detaining Veiga. In fact, at trial, Officers McGee and Johnson both admitted that they did not suspect either Goldhirsch or Veiga of any specific criminal -19- activity. See Brown v. Texas, 443 U.S. 47 (1979) (finding ___ _____ _____ unlawful seizure under the Fourth Amendment and reversing conviction of an individual arrested, after he refused to identify himself and angrily asserted that the officers had no right to stop him where the officers did not claim to suspect him of any criminal activity). Instead, the officers have asserted that Veiga was "incapacitated" and that his detention was therefore authorized under Chapter 111B. Whether the police officers acted reasonably in detaining Veiga was a question of fact for the jury to decide. In order for the jury to make this determination, it had to understand the circumstances under which Chapter 111B does and does not authorize detention. The jury was given a faulty instruction on this score. Although Chapter 111B did not authorize Officers McGee and Johnson to take Veiga into custody for the manner in which he expressed himself, the court failed to ______ make this clear when instructing the jury as to what it might consider in determining whether Veiga was "disorderly." See ___ supra pp. 15-16. Because of the faulty jury instruction, the _____ jury's response to question 2 of the special verdict form, see ___ supra note 6, cannot be interpreted as a finding that Veiga was _____ detained for a permissible reason. The jury's response could have been tainted by the misinformation it was given concerning the officers' right to arrest Veiga for disorderliness. When the jury was asked whether Veiga was taken into custody because he exercised his "right not to answer questions and/or his right to -20- oppose verbally the actions of the police," it may have been under the false impression that the protection afforded to those rights extends to content alone. Because Chapter 111B did not authorize officers to detain Veiga for the manner in which he ______ expressed himself, a detention for that reason would amount to an unlawful seizure under the Fourth Amendment and Veiga could therefore establish a Section 1983 violation.10 Because the determination of whether Veiga was detained for a valid reason turns largely on what state law authorizes, the erroneous jury instruction "could have affected the result of the jury's deliberations" and therefore "necessitates a new trial." Allen v. Chance Mfg. Co., 873 F.2d 465, 469 (1st Cir. _____ ________________ ____________________ 10 We acknowledge that such a detention would not necessarily violate the First Amendment of the federal Constitution; under the prevailing view of the free speech clause, the government may in some contexts impose reasonable restrictions on the time, place and manner of speech so long as those restrictions are made without reference to the content of the regulated speech. R.A.V. ______ v. City of St. Paul, 112 S. Ct. 2538, 2544 (1992); Ward v. Rock ________________ ____ ____ Against Racism, 491 U.S. 781, 791 (1989). But the negative _______________ freedom afforded by the First Amendment may not in itself provide a positive justification for a Fourth Amendment invasion. Furthermore, we recognize, without deciding, that under certain circumstances, yelling at the police could be a statutorily proscribed breach of the peace and be a legitimate basis for detention. In the present case, however, screaming at the police, without more, was not a legitimate reason for detaining Veiga under the Fourth Amendment. See Duran, 904 F.2d ___ _____ at 1377 (detention of individual yelling profanities at police, without more, is not a legitimate reason for police interference with personal autonomy). There are specific statutory and common law provisions that regulate breaches of the peace. It seems to us that Chapter 111B is not one of them and should not be used to curtail such behavior. In any event, no evidence was presented to suggest that Veiga did in fact breach the peace. No evidence suggested that any neighbors complained or that a single light went on in any of the nearby apartment buildings as a result of Veiga's presence in the parking lot. -21- 1989). MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT _______________________________________________ The denial of a motion for a judgment notwithstanding the verdict under Fed. R. Civ. P. 50 is reviewed de novo. __ ____ Hendricks & Assoc., Inc. v. Daewoo Corp., 923 F.2d 209, 214 (1st ________________________ _____________ Cir. 1991). We may "grant judgment notwithstanding the verdict only after a determination that the evidence could lead a reasonable person to only one conclusion." Id. (internal ___ quotation and citation omitted). We are "compelled, therefore, even in a close case, to uphold the verdict unless the facts and inferences, when viewed in the light most favorable to the party for whom the jury held, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have arrived at this conclusion." Id. (internal quotation and citation ___ omitted). We need not decide whether the evidence can support a finding that Veiga was "disorderly" within the meaning of Chapter 111B, as we have interpreted it in this opinion. This case must be retried because of the faulty jury instruction, and, in any event, in order to find that the police were justified in taking Veiga into protective custody, the jury need not find that Veiga was "disorderly." The jury could alternatively find that Veiga was incapacitated within the meaning of Chapter 111B, if by reason of intoxicating liquor, he was (1) unconscious, (2) in need of medical attention, or (3) likely to suffer or cause physical harm or damage. Mass. Gen. L. ch. 111B, 3. The -22- police officers and the City have not argued that Veiga was either unconscious or in need of medical attention. They have, however, argued that Veiga was likely to suffer or cause physical harm or damage. Veiga argues that their contention that he was at risk of causing harm to himself or to others is merely a belated excuse to try to justify the police officers' actions. Even though our reading of the record might lead us to agree with Veiga, the police officers' claim that Veiga was likely to cause or suffer harm presents a question of fact or credibility of the witnesses for the jury to decide. In deciding a motion for judgment as a matter of law, we "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Hendricks, 923 F.2d at 214. After a _________ careful review of the record, we must conclude that the evidence, taken in the light most favorable to the officers and the City, could support a finding that Veiga was likely to suffer harm or cause physical damage to himself or someone else. Therefore, Veiga is not entitled to judgment in his favor as a matter of law. In light of the improper jury instruction defining "disorderly" within the meaning of Chapter 111B, we vacate the judgment in this case and remand for a new trial consistent with this opinion. Vacated and remanded for a new trial. ____________________________________ -23-