**Roger RINGUETTE and Roger Ringuette, PPA for Crystal Ringuette, a minor, Plaintiffs,**

v.

**CITY OF FALL RIVER; Francis J. McDonald, individually and in his official capacity; Raymond Paradis, individually and in his official capacity; and Richard Levesque, individually and in his official capacity, Defendants.**

Civ. A. No. 93–11212 PBS.

United States District Court,
D. Massachusetts.

May 12, 1995.

Brian R. Cunha, Brian Cunha & Associates, Fall River, MA, for Roger Ringuette.

Diane M. Bunk, Corp. Counsel, Law Dept., Fall River, MA, Bernadette L. Sabra, Sabra Law Offices, Somerset, MA, for City of Fall River, Francis McDonald.

William G. Camara, Diane M. Bunk, Corp. Counsel, Law Dept., Fall River, MA, for Raymond Paradise.

Kenneth G. Littman, Andrew B. Peppard, Peppard & Littman, Diane M. Bunk, Corp. Counsel, Law Dept., Fall River, MA, for Richard Levesque.

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

SARIS, District Judge.

### INTRODUCTION

Plaintiff Roger Ringuette brought this action pursuant to 42 U.S.C. § 1983 claiming that the police violated his rights under the Fourth, Eighth and Fourteenth amendments and state law while he was in civil protective custody because of incapacitation due to substance abuse. Plaintiff seeks compensatory and punitive damages for the loss of the use of his left arm and leg as a result of the failure of the police to obtain adequate medical care for him. He also brings a claim for loss of consortium on behalf of his daughter. In the circumstances of this case, the Court concludes that the Fourth Amendment governs the seizure of plaintiff taken into civil protective custody under Mass.G.L. ch. 111B, and that the substantive due process clause of the Fourteenth Amendment governs the conditions of the protective custody. After hearing, the Court *ALLOWS* the motions for summary judgment of defendants Paradis and Levesque in part and *DENIES* them in part. The Court *ALLOWS* the motion for summary judgment of Chief McDonald and the City of Fall River.

### BACKGROUND

For purposes of this motion, the Court treats the following facts as undisputed. On July 27, 1992, at about 7:00 p.m., plaintiff Roger Ringuette was found by Fall River police officers slumped over a parked car. He was unsteady on his feet, had bloodshot eyes, and emitted an odor of alcohol. He appeared to the officers to be in a drunken stupor. According to the officer who found him in the street, when asked if he "want[ed] a ride home" at the time of the first seizure, Ringuette replied, "My brother's." When asked if he wanted to "go to detox," he again replied, "My brother's."

Because the police did not know the brother's address, Ringuette was taken into protective custody (PC) pursuant to Massachusetts Alcoholism Treatment and Rehabilitation Act (Chapter 111B). *See* Mass.Gen.L. ch. 111B, § 8. He was placed in handcuffs into the cruiser and transported to the station. According to the booking officer, Ringuette declined to make a phone call. No one placed a call to the Stanley Street Treatment & Resource, Inc., an in-patient detox facility for the City of Fall River. He was unable to walk to the booking room or his cell without assistance. The cell was not monitored by a video camera or within direct view of the booking officer.

Defendant Levesque was the booking room sergeant on duty at that time but did not personally book Ringuette or ever observe him throughout his shift, which ended at 11 p.m.

Defendant Paradis was on duty as booking room officer from 7:00 a.m. to 3:00 p.m. on July 28; at about 8:45 a.m. Levesque became

the sergeant in charge. Levesque then continued on duty as the sergeant in charge from 3:00 p.m. to 11:00 p.m.

After more than 12 hours, at approximately 9:00 a.m., Ringuette was "re-PC"ed; *i.e.*, his term of protective custody was renewed. The form included the false time of 7:00 a.m. Prior to being "re-PC"ed, Paradis, who knew Ringuette from previous periods of protective custody, asked if he wanted to go home. Ringuette replied, in "slurred" speech: "I've got nowhere to go and I'm still half in the bag." While there is disputed evidence as to whether Ringuette was unconscious, and the duration of any unconsciousness, he was by all accounts incoherent and incapacitated throughout his time in custody. During the first twelve hours, plaintiff was observed sitting, lying down and changing positions. After Paradis discussed Ringuette's condition with Levesque, they decided to "re-PC" him. Levesque was informed that Ringuette was still intoxicated and did not want release, but did not check him personally.

Throughout the period he was in custody, Ringuette was given neither food nor water, despite the department's handbook policy of feeding persons kept in PC for more than five hours. Also throughout the period, Ringuette was only loosely monitored—at one point going four hours without being checked upon—despite the handbook's requirement of monitoring at 15 minute intervals. At about 3:00, when Officer Almeida went on duty, he saw Ringuette sitting and then lying on the floor with a blanket around him. He refused food and mumbled incoherently. It was hard to hear Ringuette because of plexiglass over the bars.

Finally, at about 6:00 p.m. Almeida, the police officers on duty realized that something was seriously amiss, and summoned help. An emergency medical technician (EMT) discovered Ringuette in shock on the floor of the holding cell, lying motionless in a pool of vomit, mumbling incoherently, his eyes dilated and his pulse racing, his left hand, forearm, and abdomen seared by burns. The hospital doctors assessed him to be severely dehydrated, with several vital bodily functions, including kidney and liver functions, critically impaired. Ringuette was suffering from a drug overdose from prescription pills and first and second degree burns.

Ringuette's most serious permanent injury is the loss of use of his left arm and left leg, resulting from compartmental syndrome. Compartmental syndrome is a muscle tissue condition associated with drug overdose followed by tissue compression (usually due to lying in the same position for a sustained period). According to the expert testimony proffered, the onset of the syndrome most likely occurred 3 to 6 hours before the EMT's arrival, and almost surely no more than 12 hours prior to his arrival. The medical literature makes it emphatically clear that delay in treatment exacerbates the condition and hinders treatment.

The City of Fall River instituted an investigation on August 18, 1992, which resulted in charges by Chief McDonald against Paradis and Levesque. After a hearing, the City found Paradis and Levesque liable for violating various duties. Both were ordered suspended for sixty days.

Ringuette filed a 17–count complaint, individually and as representative of his minor daughter Crystal.[1] The complaint names as defendants the City of Fall River; its police chief, Francis J. McDonald; the booking room officer on duty at the time of the "re-PC"ing, Raymond Paradis; and the booking room sergeant on duty at that time, Richard Levesque. Under state common law, the complaint states a claim for negligence by the City, and by the three individual defendants, a claim for intentional infliction of emotional distress, and a claim of loss of consortium (Count II); a Fourth and Fourteenth claim against McDonald under *Monell*, (Counts III and XI); a Fourth and Fourteenth Amendment claim against McDonald as Chief of Police in his individual supervisor capacity (Counts IV and XII); a fourth and fourteenth claim against Levesque under *Monell* (Counts V and XIII); a

---

1. For the sake of simplicity, this court will consistently refer to Roger Ringuette, in the singular, as the plaintiff.

Fourth and Fourteenth amendment claim against Levesque in his individual supervisory capacity (Counts VI and XIV); a Fourth and Fourteenth Amendment claim against Paradis in his individual capacity (Counts VII and XV); an Eighth Amendment claim against all three individual defendants (Counts VIII, IX and X); and a loss of consortium claim against McDonald, Paradis and Levesque (Counts XVI and XVII).[2] Count One does not state a separate claim but simply asserts the basis for federal jurisdiction and lists the parties. The Amended Complaint, Counts II through XVII, states only a state law claim against the City of Fall River. Although it states a *"Monell"* claim under the Fourth and Fourteenth Amendments, it raises this claim against McDonald, Levesque and Paradis in their capacities as agents for the City of Fall River and seeks relief against them individually. While this is an inartful pleading, in light of the briefing, both parties seem to assume a *Monell* claim against the City of Fall River, and to avoid further litigation, the court will address such a claim.

### DISCUSSION

#### A. *Summary Judgment Standard*

A motion for summary judgment must be granted if:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "It is apodictic that summary judgment should be bestowed only when no genuine issue of material fact exists and the movant has successfully demonstrated an entitlement to judgment as a matter of law." *In re Varrasso,* 37 F.3d 760, 762 (1st Cir.1994) (citing cases).

"To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish

the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* (citations omitted). The nonmovant cannot simply rest upon mere allegations. *Id.* Instead, the nonmoving party must adduce specific, provable facts which establish that there is a triable issue. *Id.* Rule 56(e) "requires nonmovants to submit evidence that would be admissible at trial to oppose properly submitted motions for summary judgment." *FDIC v. Fonseca,* 795 F.2d 1102, 1110 (1st Cir.1986). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers, supra* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)).

#### B. *State Law Claims*

##### a. *Negligence Claims*

■ The three individual defendants correctly argue—and plaintiff concedes—that all of plaintiff's tort claims against them are based on the negligent acts of public employees acting within the scope of their offices. As such, they are barred by the State Tort Claims Act. *See* Mass.Gen.L. ch. 258, § 2. There is no such bar, however, to state law claims charged against the City. Count II, stating a negligence claim against all four defendants for injuries inflicted upon Roger and a claim for loss of consortium by Crystal Ringuette, is dismissed as to the three individual defendants, but not as to the City. *See, e.g., Eyssi v. City of Lawrence,* 416 Mass. 194, 203, 618 N.E.2d 1358, 1363 (1993) (allowing loss of consortium claim against city under Tort Claims Act).

##### b. *Intentional Infliction of Emotional Distress*

■ Count 2 also states a claim against the City for intentional infliction of emotional distress. However, under Mass.Gen.L. ch. 258, § 2, a municipality is not liable for the intentional torts of its employees. *Spring v.*

---

2. The Court assumes that there is a typographical error in Count XVII because it states a claim against Levesque, but seeks relief against Paradis.

*Geriatric Auth. of Holyoke,* 394 Mass. 274, 285, 475 N.E.2d 727, 734 (1985). There is no evidence of actions which would support a claim alleging that the conduct of Levesque, Paradis or McDonald was "extreme and outrageous," "beyond all possible bounds of decency," and "utterly intolerable in a civilized community." *Agis v. Howard Johnson Co.,* 371 Mass. 140, 145, 355 N.E.2d 315, 318–319 (1976). *See also* Restatement (Second) of Torts, § 46(1) ("one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm").

### c. *Loss of Consortium Claims*

■ Defendants are also correct that Crystal Ringuette cannot recover for loss of consortium via the constitutional counts. Under the governing precedent, Crystal did not possess a liberty interest protected by the due process clause in her familial relationship with her father. She would possess such an interest only if the state action in question were, in some way, "directly aimed at the parent-child relationship." *Manarite v. City of Springfield,* 957 F.2d 953, 960 (1st Cir.) (citing cases), *cert. denied,* —— U.S. ——, 113 S.Ct. 113, 121 L.Ed.2d 70 (1992).

Accordingly, Counts XVI–XVII do not state viable claims for loss of consortium against the three individual defendants. The loss of consortium claim against the City arising out of the alleged negligence is preserved in Count II.

### C. *Eighth Amendment Claims*

■ "[A]t some point after a person is arrested, the question whether his continued confinement or prosecution is unconstitutional passes over from the Fourth Amendment to the due process clause (and after conviction to the Eight Amendment's cruel and unusual punishment clause ...)." *Jones v. Chicago,* 856 F.2d 985, 994 (7th Cir.1988) (Posner, J.). Thus, the borderline between the realm of the Fourth Amendment and the realm of the Eighth Amendment is marked by the unmistakable signpost of conviction. *See, e.g., Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 2323, 115 L.Ed.2d

271 (1991); *Martin v. Gentile,* 849 F.2d 863, 870 (4th Cir.1988) (citing cases). Counts VIII–X are dismissed.

### D. *Fourth Amendment Claim*

Before plaintiff's Fourth Amendment claim can be addressed, background on the protective custody statute is necessary. Mass. Gen.L. ch. 111B, § 8 provides that "any person who is incapacitated may be assisted by a police officer *with or without consent* to his residence, to a facility or to a police station." (emphasis added). If a person is assisted to a police station, he has the "right" to be administered a breathalyzer test, and to be informed of that right in writing. Where the breathalyzer test or "a reasonable test of coordination or speech coherency" indicates that a person is intoxicated, the person "shall ... be placed in protective custody at a police station or transferred to a facility." The statute further provides:

If any incapacitated person is assisted to a police station, the officer in charge or his designee *shall notify forthwith the nearest facility that the person is being held in protective custody.* If suitable treatment services are available at a facility, the department shall thereupon arrange for the transportation of the person to the facility in accordance with the provisions of section seven.

No person assisted to a police station pursuant to this section shall be held in protective custody against his will; provided, however, that if suitable treatment at a facility is not available, an incapacitated person may be held in protective custody at a police station until he is no longer incapacitated *or for a period of not longer than twelve hours, whichever is shorter* ...

A person assisted to facility or held in protective custody by the police pursuant to the provisions of this section, shall not be considered to have been arrested or to have been charged with any crime. An entry of custody shall be made indicating the date, time, place of custody, the name of the assisting officer, the name of the officer in charge, whether the person held in custody exercised his right to make a

phone call, whether the person held in custody exercised his right to take a breathalyzer test, and the results of the breathalyzer test if taken, which entry shall not be treated for any purpose, as an arrest or criminal record. (Emphasis added).

Under Mass.Gen.L. ch. 111B, "in order to take a person into protective custody, the police must believe that he is *both* intoxicated *and* either unconscious, in need of medical attention, likely to suffer or cause physical harm or damage, or disorderly." *Veiga v. McGee*, 26 F.3d 1206, 1210 (1st Cir.1994). Among other things, Chapter 111B "looks out for the health and safety of those individuals attempting to protect incapacitated persons from themselves." *Id.*

■ Ringuette was entitled to the protection of the Fourth Amendment when he was taken into custody. *Id.* at 1214. Placing plaintiff in protective custody was a seizure in the constitutional sense even though it was not an arrest. *See Commonwealth v. O'Connor*, 406 Mass. 112, 120 n. 6, 546 N.E.2d 336, 341 n. 6 (1989). He was placed into a cruiser while handcuffed, kept in the booking area, and placed into a locked cell. In order to justify "official intrusion upon the constitutionally protected interests of the private citizen . . . the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant intrusion." *Veiga v. McGee*, 26 F.3d at 1214 (citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)). Plaintiff has presented no evidence to create a disputed question of fact that the police had specific and articulable facts to conclude he was incapacitated at the time of the initial seizure or that the seizure was unreasonable under the Fourth Amendment *Id.* Indeed, even if the standard were the higher one of probable cause, as suggested by *O'Connor*, the police seizure would past muster.

■ Plaintiff does contend, however, that the defendants violated his Fourth Amendment rights by not taking reasonable steps to transport him home or to a facility. The Fourth Amendment regulates the duration of confinement between the time of seizure and the time appropriate administrative steps incident to seizure are taken. *Cf. Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (4th amendment requires that person arrested without warrant be taken before a judicial officer within a reasonably brief period of time).

The officer who took plaintiff into custody (who is not a named defendant) properly asked plaintiff if he would like to be taken home or to a family member. The uncontested testimony is that plaintiff made a vague reference to police officers who are not defendants about his "brother," but was unable to give his brother's address. Plaintiff suggests that the seizing officer was constitutionally obligated to find the brother's address or plaintiff's address, information which he claims was easily accessible in the police files (because Ringuette was in custody before) or public assistance directories. Given the exigent pressures on the beat and in the stationhouse, no jury could find that the police's failure to bring Ringuette home at the time of his first seizure was unreasonable from the perspective of a reasonable officer on the scene, or that any of the named defendants ever knew of Ringuette's request to be transported to his unidentified sibling. *See Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 1871–72, 104 L.Ed.2d 443 (1989) (setting forth reasonableness standards for purposes of Fourth Amendment analysis).

■ The police violated the clear mandate of the statute that reasonable inquiries be made to determine the availability of detoxification treatment. Mass.Gen.L. ch. 111, § 8 requires that if an incapacitated person is assisted to a police station, the officer in charge shall notify the nearest treatment facility and transport him there if suitable treatment services are available. The City proffers much undisputed evidence showing that the one detoxification facility in the area was not subject to municipal control, rarely had vacant beds available on short notice, generally had a wait list of seven days, and never maintained empty beds for police use. Rita Bertoncini of the detoxification facility testified that the center "rarely had a bed available", but that the center does attempt

to place patients in other facilities. Moreover, if a bed is not available, the patient is placed on a wait list. The undisputed testimony of Nancy Paull was that in the nine years in which she has been executive director she is "unaware of any occasion" in which a person was admitted to the detox program on the same day as the request. While there was a breach of the statutory duty to call a detoxification facility, there is insufficient evidence from which a jury could find that the breach caused plaintiff any injury.

■ Plaintiff's strongest Fourth Amendment argument arises from his claim that the decision to "re-PC" him was an unreasonable seizure. Section 8 provides that no person shall be held in protective custody for a period longer than twelve hours. There is no provision in the statute for "re-PC"ing a prisoner even with consent. Sergeant Levesque, relying on information supplied by Officer Paradis, made the decision to "re-PC" plaintiff although he knew or should have known that doing so controverted the statute.[3] Even if they reasonably believed they could re-PC Ringuette with his consent, jury questions are presented as to the reasonableness of Levesque's and Paradis' actions in light of the circumstances, particularly in light of Ringuette's condition and his statements at the time. A jury question is also presented as to the causal link between those actions and plaintiff's injuries. Further, by the time of the second "PCing", a jury could reasonably find that Levesque should have personally re-examined Ringuette as required by the policy of the police department, and that both defendants should have attempted to place him in a detoxification center or make reasonable efforts to locate his home or family.

As Levesque was responsible for both the first and second decision to "PC" Ringuette, and Paradis for the second decision, the motion for summary judgment on Counts VI and VII is **DENIED** as to both.

At the same time, there is scant support in the record for plaintiff's contention that the City had a custom or policy which violated plaintiff's Fourth Amendment rights. Bertoncini and Levesque agreed that police officers frequently brought intoxicated persons to the detox facility *before* going to the station. There is no evidence of a practice or custom of not driving intoxicated persons home upon request. The portion of the record which plaintiff cites, if anything, undermines his argument.

Plaintiffs point to three statements amid the copious depositions. Paradis states that "re-PC"ing was done in unspecified, isolated instances in the past, but not by him. The officer who relieved Paradis states that he had personally witnessed one instance of "re-PC"ing in the past. And the officer on duty at the time of booking states that he personally had committed isolated, unspecified past acts of "re-PC"ing. Plaintiff has produced evidence documenting a decision to "re-PC" on at most three occasions, including Ringuette's. Standing alone, these instances are not enough to document the development of a custom, or condoning of a practice, by a policy maker. *See, e.g., Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 582 (1st Cir. 1994) ("[I]solated instances of unconstitutional activity ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference.").

In conclusion, with respect to Chief McDonald, there is no evidence of any acts or omissions by him individually or in his supervisory capacity with respect to the decision to place Ringuette in protective custody. Counts III–V—stating Fourth Amendment claims against McDonald officially, McDonald individually, and Levesque in his official capacity—are dismissed in their entirety. Counts VI–VII, stating Fourth Amendment claims against Levesque and Paradis individually, may proceed to the jury.

### E. Fourteenth Amendment Claims
#### a. Substantive Due Process

■ Defendants contend that Ringuette, when he was taken into protective

---

**3.** The applicability of qualified immunity is generally a pure matter of law, and is preferably resolved before trial. *See, e.g., Roy v. Lewiston,* 42 F.3d 691, —— (1st Cir.1994) [No. 94–1260, slip op. at p. 5]. The issue of qualified immunity will be discussed more fully *infra,* under the heading of Fourteenth Amendment claims.

custody, did not possess substantive due process rights protected under the Fourteenth Amendment. To answer this question properly, one must review the line of cases anchored by *DeShaney v. Winnebago Cty. Dep't of Soc. Svces.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

Several Supreme Court cases predating *DeShaney* signalled that a state has a duty to provide necessary services to, and to protect from injury, certain classes of persons in police custody, on the broad rationale that such persons—once they enter into a "special relationship" with the state—are rendered incapable of providing for and protecting themselves. *See Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976) (convicted prisoners); *Bell v. Wolfish*, 441 U.S. 520, 533, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979) (pretrial detainees); *Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244–45, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) (persons arrested under suspicion of having committed a crime). In a slightly different context, *Youngberg v. Romeo* applied the same rationale to hold that an individual who is involuntarily committed to a state mental hospital, at the request of his family, possesses "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." 457 U.S. 307, 324, 102 S.Ct. 2452, 2462–63, 73 L.Ed.2d 28 (1982). *See also Germany v. Vance*, 868 F.2d 9, 15 (1st Cir.1989) (state entered "special relationship," carrying with it duty to ensure access to courts, where girl was committed "against her will" to the custody of the Massachusetts Department of Youth Services).

*DeShaney* itself held that a state could not be held responsible for harm suffered by a six-year old boy at the hands of his father, in the boy's own home, notwithstanding the fact that the state had undertaken to provide the family social services, and had repeatedly been warned that such harm would ensue if it did not actively intervene. *DeShaney* distinguished the earlier "special relationship" cases as follows:

"Taken together, [these cases] stand only for the proposition that *when the State takes a person into its custody and holds him there against his will*, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *See Youngberg v. Romeo, supra,* 457 U.S., at 317, 102 S.Ct. at 2458 ("When a person is institutionalized—and wholly dependent on the State[,] . . . a duty to provide certain services and care does exist"). . . . [I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause. . . .

*DeShaney,* 489 U.S. at 199–200, 109 S.Ct. at 1005–06 (all emphasis added).

The First Circuit, along with other circuits, has applied the "voluntariness" principle of *DeShaney* in analogous contexts on several occasions, most notably in *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987 (1st Cir.1992). In *Monahan,* the First Circuit analyzed *DeShaney* in the context of a civil commitment. The plaintiff in *Monahan* was a *voluntarily* committed mental patient, with a known history of jumping out of moving vehicles, who claimed that the state was constitutionally obliged to take precautions that would have prevented him from jumping out of a state van while being transported from one state facility to another. Rejecting plaintiff's argument that he had a special relationship with the state, the First Circuit held:

"Even if some or all of the defendants were found to have acted with 'deliberate indifference' to Monahan's needs in failing properly to treat and manage him, so as to render him vulnerable to being hit by a car, their misconduct violated no constitutional duty."

*Id.* at 990–991; *see also Souza v. Pina,* 53 F.3d 423, 426 (1st Cir.1995) (". . . [T]he Supreme Court has made clear that the state has a duty to protect its citizens only upon its affirmative acts to restrain the individual's freedom to act on his own behalf—through

incarceration, institutionalization, or other restraint of personal liberty."). *Compare Fialkowski v. Greenwich Home for Children, Inc.*, 921 F.2d 459, 466 (3d Cir.1990) (no due process claim where mental patient died while voluntarily living in group home); *with Manarite*, 957 F.2d at 957 (1st Cir.1992) (apparently assuming that *involuntarily* "PC"ed intoxicated person had due process liberty interest, before holding that state was not deliberately indifferent to that interest).

Defendants point out, correctly, that under *Monahan* a person taken into custody *with his consent* is not entitled to special due process protections. They maintain that by the very terms of the Massachusetts PC statute, a person can be taken into protective custody only if he consents. This is an incorrect reading of the statute. The statute provides for taking an incapacitated person into custody "with or without his consent," and holding him there "against his will" where efforts fail to place him in a facility. Mass. Gen.L. ch. 111B, § 8.

Next, defendants argue that the facts show Ringuette to have consented because Ringuette declined the opportunity to go home at the time of both the first and the second decision to place him into protective custody. This argument fails because there remain material questions of fact as to what transpired at each of these crucial junctures. Indeed, based on the undisputed facts, plaintiff requested to be taken to his brother's and did not consent to incarceration. With respect to the decision to "re-PC" Ringuette, Paradis testified that he and Ringuette declined, stating: "I've got nowhere to go and I'm still half in the bag." However, there is also substantial evidence that Ringuette was incoherent, incapacitated and then unconscious for much of the time period of incarceration. This evidence presents the interesting question of defining voluntariness in the circumstances of a person placed into protective custody because of severe incapacitation.

*Monahan* suggests that a person taken into custody *against his will* possesses special due process rights; and that a person taken into custody *with his consent* does not. *Monahan* leaves open the question of wheth-

er a person *incapable of consenting or not consenting* may also make out a section 1983 claim. To support the claim that such a person possesses special due process rights, plaintiff relies mainly on *Garcia v. Salt Lake Cty.*, 768 F.2d 303 (10th Cir.1985). *Garcia* affirmed a jury verdict finding the county liable, under section 1983 and the Fourteenth Amendment, for failing to adequately monitor a person who was admitted to jail while *unconscious* and suspected of being drunk. *Id.* at 307–08. The case of *Merideth v. Grogan*, 812 F.Supp. 1223 (N.D.Ga.1992), *aff'd*, 985 F.2d 579 (11th Cir.1993) (table), is perhaps even more helpful to plaintiff, because it reached a similar result in the post-*DeShaney* era. *Merideth* held that a drunken, suicidal person, admitted to jail for his own protection at the request of his family, was entitled to due process protections. *Id.* at 1230 (once intoxicated person was taken in jail instead of to a hospital, the police undertook an affirmative act of restraining his freedom to act on his own behalf); *see also Buffington v. Baltimore Cty.*, 913 F.2d 113, 118–19 (4th Cir.1990) (same, except family pressed charges, to enable police to keep plaintiff in custody), *cert. denied*, 499 U.S. 906, 111 S.Ct. 1106, 113 L.Ed.2d 216 (1991).

This court concludes that the state has a duty under the constitution to protect persons who are taken into protective custody because of incapacitation and who lack the capacity to give knowing, intelligent and voluntary consent to protective custody. A jury could determine that Ringuette was either unconscious, like the plaintiff in *Garcia*, or so incapacitated as to be incapable of volition, like those in *Merideth* and *Buffington*. Ringuette's ability to give voluntary consent thus involves serious disputed questions of material fact.

b. *Qualified Immunity*

■ The main contention of the individual defendants is that they are entitled to qualified immunity. "As a predicate to [the qualified immunity] inquiry, however, a plaintiff must establish that a particular defendant violated the plaintiff's federally protected rights." *Febus–Rodriguez v. Betancourt–Le-*

*bron,* 14 F.3d 87, 91 (1st Cir.1994) (citations omitted).

The format of inquiry must take is well-defined:

> Qualified immunity shields government official performing discretionary functions from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." On a motion for summary judgment, "the relevant question is whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct."

*Febus–Rodriguez,* 14 F.3d at 91 (citations omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law" or those who act where "the law clearly proscribed the actions" taken. *Anderson v. Creighton,* 483 U.S. 635, 638–39, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). "Since a reasonable public official, particularly a police officer, is expected to know the law, our inquiry is nothing more than an examination whether the events [at issue] violated 'clearly established constitutional rights.'" *Hall v. Ochs,* 817 F.2d 920, 924 (1st Cir.1987) (citation omitted). The "clearly established" inquiry necessarily incorporates "whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991).

The Supreme Court has made clear that section 1983 permits recovery for serious physical harm "only where the defendant acts *intentionally*" or with an analogous state of mind usually described as "*deliberate indifference*" to deprivation of the victim's constitutional right. *Manarite,* 957 F.2d at 955 (citing *Canton v. Harris,* 489 U.S. 378, 388–390, 109 S.Ct. 1197, 1204–1206, 103 L.Ed.2d 412 (1989)) (deliberate indifference standard in Fourteenth Amendment municipal liability, police denial of medical treatment case). When liability for serious harm or death is at issue, a plaintiff must demonstrate "deliberate indifference" by showing (1) an unusually serious risk of harm; (2) defendant's actual knowledge of (or, at least willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known serious risk. *Manarite,* 957 F.2d at 956.

As to Levesque and Paradis, plaintiff has presented evidence that their conduct could be found by a reasonable jury to amount to deliberate, reckless, or callous indifference. *See also Germany v. Vance,* 868 F.2d at 17–18 & n. 10 (discussing applicable standard). There is evidence that Levesque and Paradis knew or should have known that they were violating a clearly established handbook requirement when they failed to monitor Ringuette every fifteen minutes. Levesque and Paradis also violated a clearly established written policy requiring that they feed persons kept in protective custody for more than five hours.

The crucial question is whether those handbook violations amounted to deliberate indifference or willful blindness to plaintiff's medical needs. While there is evidence that Ringuette had been offered nourishment but declined, this court holds that a reasonable police officer should have known that failure to monitor and provide medical treatment to a detainee who had gone without food, water, and medical treatment for over twelve hours (and as long as twenty-three hours) would run afoul of the due process clause. Even though Ringuette was a person known to have problems with alcoholism, he was still "in the bag" fourteen hours after he was placed in protective custody. That would place any reasonable person on notice that intoxication may not be the primary problem. Monitoring him and offering him food and drink at regular intervals might well have led to the discovery that something was very wrong, particularly at the time of the joint decision to "re-PC" him.

Based on plaintiff's evidence, Levesque and Paradis, as objective public officials, should have known that they were failing to provide the level of medical care guaranteed those taken into state custody by the Fourteenth Amendment. This immunity issue is very much intertwined with the correlative

jury question, *i.e.,* whether the officers' medical care was in fact constitutionally inadequate under the circumstances. Both questions hinge on material issues of relevant fact that remain in dispute: the extent of the monitoring, the reasons for failure to monitor, whether and when Ringuette declined food and water, his appearance during the monitoring, etc. For instance, if it were true *either* that Ringuette was unconscious for a significant period of time or that his serious burns were easily visible, then reasonable officers would have known he needed medical treatment.

Defendant Levesque's and Paradis' motion for summary judgment on grounds of qualified immunity is denied *in toto.* As a matter of law, this court concludes that Levesque and Paradis are not entitled to immunity against Fourteenth Amendment claims to the extent that those claims are based on the officers' alleged failure to monitor, to feed, and to provide medical care. Further, for the reasons noted earlier, the Court denies immunity on the Fourth Amendment claims.

### c. *Monell Liability*

#### 1. *Standards*

■■■■ Municipal liability under section 1983 cannot be based on *respondeat superior. Monell v. New York City Dep't of Soc. Svces.,* 436 U.S. 658, 690–95, 98 S.Ct. 2018, 2035–38, 56 L.Ed.2d 611 (1978). Municipal liability lies only when a municipal policy or custom causes the alleged constitutional deprivation. *Manarite,* 957 F.2d at 958. Liability can be imputed to a City based upon the acts or omissions of an official who possesses final authority to establish policy with respect to the action that inflicted injury on plaintiff. *See, e.g., Pembaur v. Cincinnati,* 475 U.S. 469, 479–81, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986). Thus, a "municipality can be held liable if its *police chief* is a policymaker and acquiesces in a police custom or policy as to which he has actual or constructive knowledge." *Kinan v. Brockton,* 876 F.2d 1029, 1035 (1st Cir.1989) (emphasis added).

Because a police sergeant in command of one shift cannot possibly be portrayed as clothed with ultimate policymaking authority,

Count XIII against Levesque must be dismissed. *See Collins v. San Diego,* 841 F.2d 337, 341 (9th Cir.1988) (concluding that police sergeant is not an official responsible for establishing final policy). Any actions or omissions of Levesque cannot create municipal liability. Chief McDonald alone is the proper vessel of *Monell* liability in this case.

■■■■ Supervisory liability will not be imposed unless plaintiff can satisfy the quite difficult burdens of showing the breach of a constitutional duty by McDonald, and a causal link. It is well established that a supervisor may be found liable under section 1983 only on the basis of his own acts or omissions. *Manarite,* 957 F.2d at 957. Supervisory liability may arise from "deliberate indifference" to a class of persons. *Id.* Plaintiff must here show a seriously elevated risk of drug overdose or illness by those in protective custody, the chief's knowledge of that risk, and his failure to take obvious remedial steps to the point where it amounts to deliberate indifference to the risk.

■■■■ Once plaintiff has proved the breach of a constitutional duty, he then must prove causation—a barrier equally formidable. The First Circuit has declared repeatedly that "there must be an *'affirmative link'* between the street-level misconduct and the action, or inaction of supervisory officials." *Bowen v. Manchester,* 966 F.2d 13, 20 (1st Cir.1992) (citations omitted) (emphasis added). Thus, for instance, in the case of a claim for failure to train, "the identified deficiency in a city's training program must be *closely related* to the ultimate injury." *Canton,* 489 U.S. at 391, 109 S.Ct. at 1206 (emphasis added). The court adjudicating such a claim is faced with the "but for" question: "Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Id.; see also Bowen,* 966 F.2d at 20 (applying *Canton* to reject claim that City was liable for failing to train police officers in suicide prevention).

#### 2. *Failure to Train*

■■■■ To impute to Chief McDonald responsibility for Levesque's and Paradis' al-

leged failure to attend to plaintiff's medical needs, plaintiff must show that the City is obliged to provide its police officers with some medical training beyond the in-service "First Responder" and CPR training that they now receive. That such a "failure to train" claim may succeed has been recognized by the Court: "[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390, 109 S.Ct. at 1205. In analogous situations, some courts have found a municipality deliberately indifferent for failing to institute "commonplace" suicide prevention policies. *See Manarite*, 957 F.2d at 957 (citing *Simmons v. Philadelphia*, 947 F.2d 1042, 1064–65, 1072–75 (3d Cir.1991), *cert. denied*, 503 U.S. 985, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992)).

As an initial matter, it should be recognized that the requirements of causation and knowledge are met here. Had Levesque and Paradis recognized that plaintiff required hospitalization due to a drug overdose, plaintiff would not have suffered the injuries he did. The police chief was aware that the department did not provide advanced medical training, and there was a conscious policy choice to provide only that medical training required by the state of Massachusetts. The tough question is whether the duty existed: was the need for higher level training in the signs of drug overdoses obvious, and was the risk to persons in protective custody significant in the absence of such training?

The "failure to train" claim can be recast as a demand that police officers be trained to discern the difference between drunks and drug addicts. This demand is not absurd. The National League of Cities' Report of 1985 recommended, among other things, that the police provide "closer observation and surveillance of drunks to detect illness, and that mayor appoint a high level task force to look into detention alternatives—especially an active detoxification program." The EMT who arrived on the scene was able, on the

basis of just a 40–hour training course, to recognize simple signs of drug abuse (*e.g.*, dilated pupils). The notion cannot be lightly dismissed that training police officers to look for such commonplace signs might prevent drug overdoses.

On the other hand, there is no evidence of drug overdoses or even undetected illness among those in protective custody. While the National League of Cities Report recommended better training, it did not recommend advanced medical training. There is no evidence that Fall River fell below the statewide policies for medical training, or any national standards. Plaintiff's own expert, Lou Reiter, does not even assert the failure to train in the medical needs of intoxicated persons as a basis for the plaintiff's claim of deliberate indifference. Indeed, there is no evidence as to whether training in the "First Responder" course included training in commonplace signs of drug overdose.

Particularly in light of the recommendations of the National League of Cities and the evidence of persistent problems faced by the police in obtaining beds in the private detoxification centers, there is sufficient evidence to create a jury issue as to whether Chief McDonald's failure to train police officers to discern commonplace signs of drug overdoses constitutes negligence in protecting the needs of persons in protective custody. It does not, however, amount to callous or reckless indifference to the needs of intoxicated persons in protective custody.

### 3. *Failure to Feed*

 Plaintiff's next allegation against the Chief is that the police department had an official custom of neglecting to give persons in protective custody food or water, despite a written policy to the contrary. In fact, there is agreement among the police officers deposed that persons in PC were never fed in practice. One private maintains that he "got hell from the sergeant for feeding the PC's" on the one occasion when he did so. Sergeant Levesque states that the practice was passed "from sergeant to sergeant."

The sticking point is that—even if the practice of withholding food were sufficiently serious and dangerous—supervisory liability could not be imposed unless the policymaker

had the requisite knowledge. There is no suggestion in the record that Chief McDonald had actual knowledge, and, so far as can be seen, the only basis for inferring willful blindness is the prevalence of the practice and the knowledge of several sergeants. This is insufficient to establish, even by a preponderance, that Chief McDonald was aware or should have been aware of this practice. *Cf., e.g., United States v. Brandon*, 17 F.3d 409, 451–52 & n. 72 (1st Cir.) (defining willful blindness in criminal context), *cert. denied*, — U.S. —, —, 115 S.Ct. 80, 81, 130 L.Ed.2d 34 (1994). This court rules that the Fourteenth Amendment *Monell* claim against McDonald may not proceed to the jury insofar as it relates to the failure to feed.

### 4. *Failure to Monitor*

■ By "failure to monitor," this court refers not only to the allegation that the police routinely ignored the handbook's requirement of inspection at fifteen minute intervals, but also to a number of subsidiary allegations: that the booking room and detention area were chronically understaffed; that persons taken into custody were not booked in the commanding officer's presence; that the booking room handbooks were not regularly updated; that the buzzer to remind police officers to monitor was not operational; and, generally, that steps to rectify these conditions, for instance through stricter internal guidelines or evaluations, were not taken. All of these practices are well enough documented in the record.

The prevalence of a practice is not enough to justify a finding that a "policy or custom" existed. One reason why supervisory liability for inaction is hard to establish is that a policy or custom has been defined as "a course of action *consciously* chosen from among various alternatives." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (opinion of Rehnquist, J.) (emphasis added); *accord Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989).

With respect to the failure to monitor policy, plaintiff fails in surmounting the hurdle of the "knowledge" requirement. Plaintiff leans heavily on a well-publicized 1985 report

by the National League of Cities, which called attention to the monitoring deficiencies of the Fall River lock-up in no uncertain terms. The Report observed:

> The jail has caused both the Department and the City considerable embarrassment in the past and will continue to do so. The arrangement for inspection and supervision of prisoners is weak and, *sooner or later ... a prisoner will be injured or ill during a period when the press of other business precludes the prescribed inspection schedule ....* [T]he City can expect to inherit the predictable adverse publicity and civil litigation. The probability of this sort of mishap increases with the use of the facility. To reduce the exposure, supervisory and management personnel should constantly review the use of the detention to ensure that persons are jailed only when absolutely necessary and then released or transferred as early as possible. Shift commanders should ensure that the required inspections are made on time and that at least 2 employees respond to any unusual situation.

National League of Cities Report, at 7–44 (emphasis added). The First Circuit has persuasively explained why warnings of this nature *can* help to satisfy the knowledge requirement for supervisory liability:

> An important factor in determining whether a supervisor is liable to the extent he has ... been deliberately indifferent to the behavior of a subordinate[ ] is whether the official was put on notice of behavior which was likely to result in the violation of the constitutional rights of citizens. "[O]ne cannot make a 'deliberate' or 'conscious' choice ... to act or not to act unless confronted with a problem that requires taking affirmative steps. Once an official is so notified, either actually or constructively, it is reasonable to infer that the *failure* to take such steps as well as the actual taking of them constitutes a choice 'from among various alternatives.' ... One obvious 'alternative' is to do something to make the violations stop."

*Febus–Rodriguez*, 14 F.3d at 93 (citations omitted); *see also Maldonado–Denis*, 23 F.3d at 582 (1st Cir.1994).

In this case, however, seven years elapsed between the publication of the Report and the disputed incident. In the interim, a great many modifications in plant and procedure were implemented, partially in response to the Report's complaints. Defendant Mc-Donald lists no fewer than 17:

 a) repainting the cell block area;

 b) installation of plexi-glass inside the bars of the cells;

 c) improved lighting;

 d) update plumbing to cells;

 e) improved ventilation of cells;

 f) designation of suicide prevention cell;

 g) installation of video equipment for monitoring suicide prevention cell;

 h) replacement of cell monitoring boxes to self-contained tape system;

 i) segregation of juvenile detention area;

 j) segregation of female lock-up area with matron;

 k) installation of plexi-glass window behind booking desk to view certain cells;

 l) formulation and revision of Booking Room Handbook and Night Sergeant's Handbook as guidelines to follow in booking area;

 m) removal of storage items from cell block area;

 n) changing the position of Chief of Police from civil service to contract with the City;

 o) removal of appointive and operational responsibilities from Police Board to Chief of Police, leaving Police Board as advisory body;

 p) update and revision of Fall River Police Department Rules and Regulations book; and

 q) formalizing complaint and disciplinary process.

*See* McDonald Affidavit at ¶¶ 35–36. These changes, particularly those designed to improve monitoring capacity, in conjunction with the passage of time, serve to attenuate

the link between the warning given in the Report and the Ringuette incident. Most significantly, McDonald consciously chose to maintain the fifteen minute monitoring requirement even after the statutory requirement in Mass.Gen.L. ch. 40, § 36B had changed that requirement to a reasonableness standard.[4] In addition, Chief McDonald states under oath that he was unaware of any custom or practice on the part of his Department to monitor persons in protective custody at intervals greater than those prescribed by law. *Id.* at ¶¶ 25–26. There is no evidence of any failure to detect a drug overdose or illness after 1985 for those in protective custody which would have alerted him to any systemic monitoring problem. Moreover, McDonald considered the violations of Paradis and Levesque to be serious enough to warrant disciplinary proceedings and suspension.

The police officers' depositions do reflect a widespread feeling in the lower and middle ranks of the force that the booking room was so busy that it could not be properly manned by a single officer. Defendant Almeida opines that it was understaffing that made strict observance of the 15–minute monitoring rule impossible, and states that he complained about understaffing to his supervising day sergeant. Both that sergeant and Sergeant Levesque state that they were aware of the understaffing problem, and each relayed the concern to their superior, Lieutenant J.R. Costa; Levesque repeatedly requested the assignment of a second officer to the booking room. There the documented travel of the complaint up the chain of command stops.

On the basis of this record, this court cannot conclude that Chief McDonald had *actual* knowledge of the complaints. Nor can it be concluded that the understaffing was " 'so widespread or flagrant that in the proper exercise of [his] official responsibilities the [Chief] should have known of [it].' " *See, e.g., Thelma D. v. Board of Educ.,* 934 F.2d 929, 933–34 (8th Cir.1991) (citation omitted) (refusing to impute knowledge of low

**4.** G.L. c. 40, § 36B, as amended in 1987, provides that each occupied cell shall be physically or visibly checked by lock-up personnel "as often as is required by a reasonable standard of care of detainees."

level employees to the governing body, because to do so on the facts of that case would in effect sanction *respondeat superior* liability).

This court concludes that plaintiff's failure to monitor theory for *Monell* liability fails for lack of evidence that Chief McDonald had the requisite knowledge or state of mind to demonstrate a callous or reckless indifference to the needs of those in protective custody. The tricky questions relating to causation under the failure to monitor theory need not be reached. All of plaintiff's theories having been considered and rejected, this court concludes that the claim for supervisory (*Monell*) liability against Chief McDonald and the City of Fall River, for violations of the Fourteenth Amendment (Count XI), may *not* proceed to trial.

### ORDER

#### 1. *Paradis*

The Motion for Partial Summary Judgment by Defendant Paradis (Docket # 74) is **GRANTED** as to the following counts: Count 2 and Count 10 (8th Amend.) and Count 17 (loss of consortium). It is **DENIED** as to Count 7 (4th Amend.), and Count 15 (14th Amend.).

#### 2. *Levesque*

The Motion for Partial Summary Judgment by Defendant Levesque (Docket # 67) is **GRANTED** as to the following counts: Count 2, Count 5 (4th Amend., *Monell*), Count 9 (8th Amend.), Count 13 (14th Amend., *Monell*), and Count 18 (loss of consortium). It is **DENIED** as to Count 6 (4th Amend., individual) and Count 14 (14th Amend., individual).

#### 3. *Chief McDonald*

The Motion for Partial Summary Judgment by Defendant McDonald is **GRANTED** as to the following counts: Count 2, Count 3 (4th Amend., *Monell* claim), Count 4 (4th Amend., individual), Count 8 (8th Amend.), Count 11 (14th Amend., *Monell*); Count 12 (Fourteenth Amend.); and Count 16 (loss of consortium).

#### 4. *The City of Fall River*

The Court treats all the so-called *Monell* claims as claims against the City. The Court **GRANTS** the motion for summary judgment on the claim for municipal liability against the City under the Fourth and Fourteenth Amendments.